## CITIZENS' STATE BANK OF VICI v. GETTIG.

No. 9269.—Opinion Filed Dec. 23, 1919.

(Syllabus by the Court.)

1. **Warehousemen—Mingled Goods—Title—Statutes.**

Section 23 of chapter 288, Session Laws of 1915, providing: "If authorized by agreement or by custom, a warehouseman may mingle fungible goods with other goods of the same kind and grade. In such case the various depositors of the mingled goods shall own the entire mass in common, and each depositor shall be entitled to such portion thereof as the amount deposited by him bears to the whole"—refers to all warehouses, whether bonded or not.

2. **Statutes—General and Special Statutes—Conflict.**

A statute which is enacted for the primary purpose of dealing with a particular subject, and which prescribes the terms and conditions of that particular subject-matter, supersedes a general statute which does not refer to the particular subject-matter, but does contain language which might be broad enough to cover the subject-matter if the special statute was not in existence.

Error from District Court, Woodward County; J. C. Robberts, Judge.

Action by J. F. Gettig against the Citizens State Bank of Vici. Judgment for plaintiff, and defendant brings error. Affirmed.

Harry H. Smith, for plaintiff in error.

Swindall & Wybrant, for defendant in error.

McNEILL, J. J. F. Gettig brought suit against the Citizens State Bank of Vici for conversion of 388 bushels and 30 pounds of wheat that plaintiff had stored in the warehouse at Vici, Oklahoma, and alleged the defendant bank had converted it to its own use. The bank's answer was a general denial. The Vici Warehouse Company was operating an elevator at Vici, and dealing in broom corn, grain, flour, feed, etc., which elevator was owned by J. S. Townsend, advertising as manager. As to who had charge and control of the Vici Warehouse Company at the time the wheat was stored, that was one of the questions in dispute. The evidence is conflicting. It was the contention of Gettig, the plaintiff, that the bank itself had charge of the warehouse and was operating and conducting the same, and that the bank had placed the vice president of the bank in charge of the company's business. This contention was supported by several other parties who had dealings with the warehouse company, and in which they contended the officers of the bank stated they were in effect conducting the business. This was denied by the officers of the bank, who admitted that Mr. Jones worked for the Vici Warehouse Company, and while he was vice president of the bank, but insisted he was not an active officer of the bank, and that the bank had nothing to do with the business of the warehouse.

Mr. Gettig stored his wheat with the Vici Warehouse Company. The wheat was delivered in December, 1915, and the scale tickets were delivered to Mr. Gettig, showing the amount of the wheat stored. Some of the tickets were signed by Mr. Jones. In April, 1916, Mr. Gettig wrote to the warehouse company regarding the selling of the wheat. The warehouse company replied that they would pay him 88 cents for the wheat as it tested 55 pounds. This letter was signed, "Vici Warehouse Company," but the evidence disclosed that Mr. Jones had written the letter.

Mr. Gettig, after receiving said letter, notified the warehouse company that he would accept the offer, but in the meantime Mr. Townsend and the bank had some difficulty, and Townsend claimed the bank was to settle for the wheat, and the bank claimed that Townsend was to pay for the same. Mr. Gettig went to Vici to see about his wheat, and was advised that the wheat had been sold long prior thereto, and was informed by Townsend that the bank had charge of the elevator and would pay for the wheat, and demand was then made on the bank, and the bank refused to pay for the same.

As to who was in charge of the Vici Warehouse Company, whether the bank or Mr. Townsend, was a question that was submitted to the jury, and upon this question no error is predicated. The court submitted the issues upon two theories:

First. If the bank was in charge of the warehouse, and had sold and converted the wheat, it was liable therefor.

Second. If Townsend was in charge of the warehouse, and the bank aided, abetted, or assisted in the disposing of the wheat, and received the proceeds therefrom, then the bank would be liable.

It was admitted that the Vici Warehouse Company was not a bonded warehouse, and Mr. Gettig was advised at the time the wheat was stored that the warehouse company was not permitted to receive wheat for storage, but he might leave the same there until he desired to sell the same. The case was tried to a jury, and the jury returned a verdict in favor of Gettig, and from said judgment the bank has appealed.

For reversal the bank contends that, under the facts in the case, the deposit of the wheat in the warehouse by Mr. Gettig amounted to a sale and not a bailment, and the transaction is controlled by sections 1089 and 1124, Revised Laws 1910, and said sections, in so far as they relate to the storage of grain in an elevator or warehouse other than a public warehouse, were not superseded by section 23, chap. 288, Session Laws of 1915.

In construing statutes it is often necessary to look to the history of the law. In the year 1899, the Legislature of Oklahoma Territory passed a law defining public grain warehouses, and provided for the inspecting, licensing, and bonding of the same. This law has been carried forward in the different statutes of the state, and was reenacted into the Revised Laws of 1910 as chapter 80, being sections 8245 to 8296.

The Legislature of 1907-1908 enacted a law relating to public cotton and broom-corn warehouses. Thereafter, the Legislature, in 1915, adopted what is known as the Uniform Warehouse and Receipt Act, which was approved March 30, 1915. Section 23 of said act is as follows:

"If authorized by agreement or by custom,

a warehouseman may mingle fungible goods with other goods of the same kind and grade. In such case the various depositors of the mingled goods shall own the entire mass in common, and each depositor shall be entitled to such portion thereof as the amount deposited by him bears to the whole."

Section 24 is as follows:

"The warehouseman shall be severally liable to each depositor for the care and redelivery of his share of such mass, to the same extent and under the same circumstances as if the goods had been kept separate."

The act of the Legislature of 1899 dealt with public warehouses, and provided for the inspection, licensing, and bonding of the same. The act of the Legislature of 1907-1908, dealing with cotton and broom-corn public warehouses, recognized the fact that there could be private warehouses as well. This fact is especially referred to in section 8307.

The Legislature of 1915, in adopting what is known as the Uniform Warehouse Receipts Act, enacted a law dealing with the subject of depositing goods in warehouses. The act does not attempt to deal alone with public warehouses, but deals generally with all warehouses, and regulates the status of the parties, and determines their rights, and fixes their liabilities; and in doing so they enacted sections, 22, 23, and 24 of the act, which deals with the identical question involved in the case at bar.

Counsel for the plaintiff in error, the bank, suggested that this law is not applicable, for the reason that this was not a bonded warehouse, and therefore we should look to the act relating to bailments to determine the rights of the parties. Could it be said that the intention of the Legislature was that, if you deposited grain in an elevator that was a bonded warehouse, the warehouseman would be considered a bailee, and if the grain was mixed or mingled with other grains that you would be entitled to your proportion thereof, as the amount deposited by you bears to the whole, while if you deposited your grain in an elevator that was not bonded, and the warehouseman had no license to operate a bonded warehouse, and the grain was deposited under the same conditions and the same terms, that the warehouseman would not be a bailee, but the transaction would be considered a sale? With this we cannot agree. The Uniform Warehouse Receipt Act defines and fixes the rights and liabilities of the parties in the storing of grain, and is a full and complete treatise on the subject, and makes no distinction between public and private warehouses, or between bonded and unbonded warehouses, but regulates

the storage of goods. True, the act defines a warehouseman as follows:

"A person lawfully engaged in the business of storing goods for hire for profit."

It might be contended that the evidence disclosed in this case that no charge was to be made for the storing of goods. That is true, but the profit anticipated was the expectancy of buying the goods in the future, and the profit expected to be derived therefrom.

The rule in the construction of general and special statutes, as laid down by this court, is as follows:

"A statute which is enacted for the primary purpose of dealing with a particular subject, and which prescribes the terms and conditions of that particular subject-matter, supersedes a general statute which does not refer to the particular subject-matter, but does contain language which might be broad enough to cover the subject-matter, if the special statute was not in existence." Gardner v. School District No. 87, Kay County, 34 Okla. 716, 126 Pac. 1018; Muskogee Times-Democrat v. Board of Com'rs of Muskogee County, 76 Oklahoma, 184 Pac. 591.

Sections 1089 and 1124 do not refer to the depositing of grain in elevators or warehouses, but they are sufficiently broad to include said subject. The Uniform Warehouse Receipts Act deals specially with the depositing of fungible goods in warehouses where it is anticipated that the same will be mixed with goods of like character, and determines the rights of the parties. Therefore, by applying the rule adopted in the cases of Gardner v. School District No. 87 and Muskogee Times-Democrat v. Board of County Com'rs, supra, that a special statute referring to the particular subject-matter will control, the court correctly instructed the jury as to the law in the case. and it was not error to refuse the instructions offered.

There being no prejudicial error in the record, the judgment of the trial court is affirmed.

OWEN, C. J., and PITCHFORD, HIGGINS, and BAILEY, JJ., concur.