## JOY v. FARMERS NAT. BANK OF CHICKASHA.

No. 20773.   Opinion Filed April 26, 1932.

Rehearing Denied June 7, 1932.

Melton & Melton, for plaintiff in error.

Bailey & Hammerly, for defendant in error.

CULLISON, J.   Defendant in error herein, plaintiff below, instituted suit in the district court of Grady county, Okla. (cause No. 10808), seeking to recover for the conversion of 25 bales of cotton represented by 25 warehouse receipts delivered to plaintiff as security for a loan of $1,875.

Plaintiff filed a second suit in the district court of Grady county, Okla. (cause No. 10809), seeking to recover a similar amount and under the same circumstances as enumerated in cause No. 10808.

The elements involved in both cases being identical, said cases were consolidated for trial, which trial resulted in judgment for plaintiff bank.

Defendant appeals to this court.

The parties will be referred to as they appear in the lower court.

The record discloses: That defendant, M. A. Joy, owned and operated a cotton compress and storage warehouse in Chickasha, Okla. That W. D. Trueblood was the general manager of defendant's business at Chickasha and was in complete charge and control of said business. That defendant Joy resided in Texas and was seldom at the Chickasha plant. Trueblood approached the plaintiff and requested a loan of money from plaintiff. He presented 25 warehouse receipts which he offered as security for said loan, each warehouse receipt representing one bale of cotton located in defendant's warehouse.

Plaintiff made said loan to Trueblood and took his note with the 25 warehouse receipts as security for the loan. The loan was not paid at maturity. Plaintiff demanded of defendant that defendant surrender to plaintiff the cotton represented by the 25 warehouse receipts. Defendant refused to deliver said cotton.

The record further shows that the warehouse receipts pledged by Trueblood to plaintiff were receipts covering cotton that had been delivered to defendant's warehouse, and that the owners of said cotton had surrendered the receipts to defendant Joy upon receipt of their cotton and that Trueblood, as superintendent of defendant's warehouse, had wrongfully taken said receipts and pledged them to the bank instead of canceling the same as should have been done when the receipts were surrendered by the owners of the cotton upon delivery of the cotton to them.

Defendant's first specification of error is that:

"Defendant's cotton compress is not a public warehouse and the public warehouse statutes have no application."

"Warehouseman" is defined under section 11180, C. O. S. 1921, as follows:

"11180. Terms Defined: (1) In this act,

unless the context or subject-matter otherwise requires— * * * 'Warehouseman' means a person lawfully engaged in the business of storing goods for a profit. * * *"

We observe that under the definition, a "warehouseman" means a person lawfully engaged in the business of storing goods for profit.

In the case of Traders' Compress Co. v. Precure, 140 Okla. 40, 282 P. 165, at page 42 in the opinion (282 P. 167), this court held:

"In the case of Citizens' State Bank of Vici v. Gettig, 77 Okla. 48, 187 P. 217, 218, this court held:

" 'The Uniform Warehouse Receipts Act defines and fixes the rights and liabilities of the parties in storing of grain, and is a full and complete treatise on the subject, and makes no distinction between public and private warehouses or between bonded and unbonded warehouses, but regulates the storage of goods.'

"Therefore the defendant compress company, although a private warehouse, comes within the terms of the above-quoted statute."

In accordance with the above decision of this court, it is immaterial whether defendant was a public or private warehouse, because said warehouse comes within the terms of the Warehouse Act of this state.

We will consider defendant's second and third propositions together, which said propositions are:

(2) "That the cotton tickets in controversy are not warehouse receipts, and the Uniform Warehouse Receipts Act has no application, such instruments being cotton weight tickets and not negotiable warehouse receipts.

(3) "If the cotton tickets can be construed to be warehouse receipts within the provisions of the Uniform Warehouse Receipts Act, yet such tickets are not negotiable under the provisions of such act."

Section 11124, C. O. S. 1921, is a section of our statute describing what a warehouse receipt shall contain.

Briefly summarized, said section provides that said receipt shall contain the location of the warehouse, date of issue, consecutive number of the receipt, whether the goods will be delivered to bearer or specified person or his order, rate of storage, description of the goods, signature, if issued for goods of which the warehouseman is owner solely or jointly with others, statement of such fact, and the amount of lien claimed by warehouseman.

The following sections of our statute are applicable to the matter under discussion: Sections 11126, 11127, and 11129, C. O. S. 1921.

"11126. Nonnegotiable: A receipt in which it is stated that the goods received will be delivered to the depositor, or to any other specified person is a nonnegotiable receipt.

"11127. Warehouse Receipts Negotiable: A receipt in which it is stated that the goods received will be delivered to the bearer, or to the order of any person named in such receipt, is a negotiable receipt. No provision shall be inserted in a negotiable receipt that it is nonnegotiable. Such provision, if inserted, shall be void."

"11129. Nonnegotiable Receipts: A nonnegotiable receipt shall have plainly placed upon its face by the warehouseman issuing it 'nonnegotiable,' or 'not negotiable.' In case of the warehouseman's failure so to do, a holder of the receipt who purchased it for value supposing it to be negotiable, may, at his option, treat such receipt as imposing upon the warehouseman the same liabilities he would have incurred had the receipt been negotiable. This section shall not apply, however, to letters, memoranda, or written acknowledgments of an informal character."

Section 11126 describes a nonnegotiable receipt, and section 11127 describes the provisions of a negotiable receipt, but section 11129 imposes a further restriction upon a nonnegotiable receipt and provides that the receipt shall have plainly placed upon its face by the warehouseman issuing it, "nonnegotiable," or "not negotiable." Said section further provides that if the warehouseman fails to so do, the liability of the warehouseman would be the same as though the receipt had been negotiable, in the hands of a holder of the receipt who purchased it for value, supposing it to be negotiable.

The warehouse receipts in question in the case at bar are attached to the record and do not provide by specific words that said property will be delivered to the order or to bearer. Said receipt provides, after describing the property covered in said receipt, "to be delivered only on return of this receipt and payment of all charges."

According to the terms and conditions of the receipt, the only condition placed upon delivery of the property by defendant was that the specific receipt issued for the designated bale of cotton be delivered to the defendant with the payment of all charges against said cotton.

Nowhere on said receipt is there a state-ment that the same is "nonnegotiable," or "not negotiable."

Section 11129 of our Uniform Warehouse Receipts Act is almost identical with section 8 of the Massachusetts Warehouse Act (St. 1907, c. 582) which said section was considered and construed in the case of Lynn Storage Warehouse Co. v. Senator, 3 Fed. (2d) 558, and at page 563 of the opinion the court said:

"The receipt did not have stamped upon its face or elsewhere the words 'nonnegotiable,' or 'not negotiable,' and this being so, as was held in Joseph v. P. Viane, Inc., 118 Misc. Rep. 344, 194 N. Y. S. 235, affirmed 206 App. Div. 698, 199 N. Y. S. 930, the receipt 'was in legal effect negotiable, as respects the warehouseman, if the holder of it purchased it for value supposing it to be negotiable,' although as respects any party to the transaction other than the warehouseman, it would not be. Eccles v. Munn, 138 Ark. 99, 210 S. W. 626. If, therefore, the plaintiff, at the time he brought this action, had previously purchased the receipt for value supposing it to be negotiable and obtained actual possession of it, he was a holder (section 1) and could maintain this action against the warehouseman, the defendant, for failure to take up and cancel the receipt; that being the warehouseman's duty under section 12, where he delivers goods for which he has issued a negotiable receipt, except in cases provided for in section 35 of the act, which are not applicable. And this is apparently so without regard to whether a holder of a nonnegotiable receipt would, under such circumstances, acquire the legal title to the goods covered by it."

And, also, at page 564, the court said:

"As we understand it, section 8 gives the plaintiff, if he was a holder of the receipt, having purchased it for value supposing it to be negotiable, a direct contract right against the warehouseman the same as though the receipt ran to his order, and the defendant, the warehouse company having failed to take up and cancel the receipt when it delivered the goods, as required by section 12, may be held as for a breach of contract, or, having failed to deliver the goods on demand, as for a conversion of them."

In the case of Traders' Compress Co. v. Precure, 140 Okla. 40, 282 P. 165 (supra), this court held:

"Therefore, the defendant compress company, although a private warehouse, comes within the terms of the above quoted statute."

After considering the sections of our Uniform Warehouse Receipts Act, and the construction placed thereon, we arrive at the

conclusion that the tickets in controversy come within the terms and provisions of the Uniform Warehouse Receipts Act, and that said receipts are negotiable under the terms and conditions of said act.

Defendant next contends:

"That if the cotton tickets are construed as negotiable under the Uniform Warehouse Receipts Act, the evidence shows that the cotton described in the tickets was delivered to the rightful owners and the tickets surrendered to the compress company long prior to the date they were delivered to plaintiff, and that this constituted a 'lawful excuse' within the provisions of such act for defendant's failure to deliver the cotton."

This brings to our consideration the question of what constitutes a lawful excuse for failure to deliver goods under a negotiable warehouse receipt.

Section 11130, C. O. S. 1921, is as follows:

"11130. Delivery of Goods—When Required: A warehouseman, in the absence of some lawful excuse provided by this act, is bound to deliver the goods upon demand made either by the holder of a receipt for the goods or by the depositor, if such demand is accompanied with:

"(a) An offer to satisfy the warehouseman's lien.

"(b) An offer to surrender the receipt. * * *

"(c) A readiness * * * to sign (for the goods). * * *

"In case the warehouseman refuses or fails to deliver the goods in compliance with a demand by the holder or depositor so accompanied, the burden shall be upon the warehouseman to establish the existence of a lawful excuse for such refusal."

Section 11133, C. O. S. 1921, is as follows:

"11133. Delivery Without Negotiable Receipt—Liability: Except as provided in section 36, where a warehouseman delivers goods for which he had issued a negotiable receipt, a negotiation of which would transfer the right to the possession of the goods, and fails to take up and cancel the receipt, he shall be liable to any one who purchases for value in good faith such receipt, for failure to deliver the goods to him, whether such purchaser acquired title to the receipt before or after the delivery of the goods by the warehouseman."

Under the above section of the statute, the warehouseman is liable where negotiable receipts have been delivered to the warehouseman and said warehouseman fails to take up and cancel said receipts, and the receipts therefor fall into the hands of a purchaser for value in good faith.

The only exception to this rule is section 36 of the act, to wit, section 11158 herein, which said section provides that where goods have been lawfully sold to satisfy the warehouseman's lien, or have been lawfully sold because of their perishable or hazardous nature, the warehouseman shall not thereafter be liable for failure to deliver the goods to the depositor, or owner of the goods, or to a holder of the receipt for the goods, when they were deposited, even if such receipt be negotiable.

The only other limitation as to delivery on a negotiable receipt is where there are conflicting claims as to ownership.

The evidence shows that plaintiff acquired the warehouse receipts in good faith and parted with its money therefor. It had no notice that there was any defect in the title to said receipts.

The fact that Trueblood, as general manager for defendant's business in Chickasha, had received the warehouse receipts from the parties rightfully owning the cotton, and had surrendered the cotton upon the receipt of the receipts, but had failed to cancel the receipts immediately upon receiving the same, would not constitute a lawful excuse for defendant's failure to deliver the cotton on the negotiable warehouse receipts when so requested by plaintiff.

In the case of Lynn Storage Warehouse Co. v. Senator, supra, the court held:

"That the defendant, the warehouse company, having failed to take up and cancel the receipt when it delivered the goods, as required by section 12, may be held as for a breach of contract, or having failed to deliver the goods on demand, as for a conversion of them."

This statement of law is exactly in point in the case at bar, and under such construction defendant could not escape liability because his agent failed to take up and cancel the receipts.

Defendant next contends that plaintiff acquired no right or title to the cotton described in said receipts, because Trueblood had no right or title and under the provisions of the Uniform Warehouse Receipts Act could transfer to plaintiff no title. the tickets, as shown by the evidence and found by the court, having been stolen by Trueblood.

We will consider said question in connection with the sections of our Warehouse Act applicable thereto.

Section 11162 is as follows:

"11162. By Whom May Be Negotiated: A negotiable receipt may be negotiated: (a) By the owner thereof, or (b) by any person to whom the possession or custody of the receipt has been entrusted by the owner, if, by the terms of the receipt the warehouseman undertakes to deliver the goods to the order of the person to whom the possession or custody of the receipt has been entrusted, or if at the time of such entrusting the receipt is in such form that it may be negotiated by delivery."

Section 11169 provides:

"11169. Fraudulent Negotiation—Validity: The validity of the negotiation of a receipt is not impaired by the fact that such negotiation was a breach of duty on the part of the person making the negotiation, or by the fact that the owner of the receipt was induced by fraud, mistake, or duress, to entrust the possession or custody of the receipt to such person, if the person to whom the receipt negotiated, or a person to whom the receipt was subsequently negotiated, paid value thereof, without notice of the breach of duty, or fraud, mistake or duress."

In discussing the question under consideration we must determine whether Trueblood acquired the warehouse receipts under consideration by stealing the same or whether the larceny was by fraud. If the property was acquired by larceny, a different rule of law is applicable to where the property is acquired by fraudulent means. Where goods or property have been stolen, the thief acquires no title and can impart no title to anyone dealing with him. However, in the case at bar the taking was by fraud. The fraud was perpetrated upon the owner of the cotton compress. He had imposed confidence in Trueblood, his manager, and held him out to the public as his agent. Trueblood was in supreme authority at the compress. If the warehouse receipts had been stolen by some trespasser on defendant's property and the thief had presented the warehouse receipts to plaintiff for loan thereon, plaintiff would have made said loan at its peril, because it could have called defendant's superintendent and ascertained the true status of the receipts. But in the case at bar, defendant's agent is the person who commits the wrong. When Trueblood appeared at plaintiff's bank seeking the loan of money and presented the warehouse receipts as security for the loan, we have a different situation to where the wrongful taking of the receipts is by stealth. Plaintiff could not inquire of defendant's superintendent and secure additional information on the warehouse receipts, because said receipts had been presented by defendant's superintendent. If plaintiff called defendant to inquire about the warehouse receipts, the person in authority who should answer its inquiry was Trueblood, the party who had perpetrated the fraud, and quite surely he would give the same information as given when securing the loan.

Plaintiff and defendant were both innocent of the wrongdoings of Trueblood, but defendant had reposed trust and confidence in said agent and placed him in a position to consummate the fraud.

Under the existing facts, we know of no more pertinent statement of law than that made by Lord Holt:

"Where one of two innocent parties must suffer from the fraud of a third, he who reposes trust and confidence in the fraudulent agent ought to bear the loss."

In the case of Fletcher v. Great Western Elevator Co., 82 N. W. 184, the Supreme Court of South Dakota had under consideration the effect of the issuance of fraudulent warehouse receipts and in discussing said matter the court held:

"A warehouseman, whose agent fraudulently issues a receipt for grain, which has not been received, is estopped to deny that the grain mentioned in the receipt has been received, as against a bona fide holder for value. * * * 'Warehouse receipts are written statements that the party named in the receipt has deposited or left for storage certain personal property, which the receiptor acknowledges to be in his possession. When a warehouseman issues such a receipt, it puts it in the power of the holder to treat with the public on the faith of it. He enables him to say that he has certain property which he can sell or pledge for a loan of money. If the warehouseman gives to the party who holds such receipt a false credit, he will not be suffered to contradict the statement that he made in the receipt, so as to injure a party who has been misled by it. That is within the most exact definition of estoppel. If A. gives B. a warehouse receipt for articles which he has never received, a third party, treating with B. on the faith of the statement contained in the receipt, will hold A. for the goods or their value. It is of no consequence what the transaction may be between the original parties, whether the receipt is a security for a loan or entirely false'."

The early rule adopted by the United States courts was to the effect that where the agent wrongfully did some act his principal would not be bound thereby, as held in the Freidlander Case, but said view has been overruled by the Supreme Court of the

United States in the case of Gleason v. Seaboard Air Line Railway Co., 73 L. Ed. 415, at page 418:

"And we think that the restriction of the vicarious liability of the principal adopted by the court below is supported no more by reason than by authority. Undoubtedly, formal logic may find something to criticize in a rule which fastens on the principal liability for the acts of his agent, done without the principal's knowledge or consent and to which his own negligence has not contributed. But few doctrines of the law are more firmly established or more in harmony with accepted notions of social policy than that of the liability of the principal without fault of his own. Shaw, Ch. J., in Farwell v. Boston & W. R. Corp. 4 Met. 49, 55, 38 Am. Dec. 339, 15 Am. Neg. Cas. 407. Bartonshill Coal Co. v. Ried, 3 Macq. H. L. Cas. 266, 283, 19 Eng. Rul. Cas. 107. See Pollock, Torts, 1887, *67, 68; Salmond, Jurisprudence, 2d Ed. 1907, 381. The tendency of modern legislation in Employers' Liability and Workmen's Compensation Acts and in the Bills of Lading Act cited, and of judicial decision as well, has been to enlarge rather than curtail the rule.

"Granted the validity and general application of the rule itself, there would seem to be no more reason for creating an exception to it because of the agent's secret purpose to benefit himself by his breach of duty than in any other case where his default is actuated by negligence or sinister motives. In either case the injury to him who deals with the agent, his relationship and that of the principal to the agent's wrongful act, and the economic consequence of it to the principal in the conduct of whose business the wrong was committed are the same.

"The arguments in favor of creating such an exception are equally objections to the rule itself. Holmes, Common Law, 1882, 231, n. 3. But as we accept and apply the rule, despite those objections, we can find no justification for an exception which is inconsistent both with the rule itself and the underlying policy which has created and perpetuated it. We think that the Freidlander Case should be overruled so far as it supports such an exception and that the judgment of the court of appeals should be reversed."

We also observe that in accordance with section 11162, supra, a negotiable receipt may be negotiated by any person to whom the possession or custody of the receipt has been intrusted by the owner, if, by the terms of the receipt, the warehouseman undertakes to deliver the goods to the order of the person to whom the possession or custody of the receipt has been intrusted, or if at the time of such intrusting the receipt is in such terms that it may be negotiated by delivery.

The testimony in said cause disclosed that the warehouse receipts in question were negotiated in Chickasha, Okla., and had been long prior thereto without requiring an indorsement on said receipt.

We further observe that, according to section 11169, the validity of the negotiation of said receipt is not impaired by the fact that such negotiation was a breach of duty on the part of the person making the negotiation or by the fact that the owner of the receipt was induced by fraud, mistake, or duress to intrust the possession or custody of the receipt to such person, if the person to whom the receipt was negotiated or a person to whom the receipt was subsequently negotiated paid value therefor, without notice of the breach of duty or fraud, mistake, or duress.

It therefore plainly appears that defendant having clothed Trueblood with authority to handle said receipts and in accordance with the statute and decisions quoted herein, he could not deny the transfer made by Trueblood.

Defendant's final proposition is that:

"The circumstances under which plaintiff received the tickets from Trueblood, the condition of the tickets as shown by an examination, and the plaintiff's knowledge of such conditions and circumstances, as shown by the evidence, and plaintiff's admitted failure to make inquiry or investigation, and the fact that such tickets were stolen, is sufficient evidence requiring the question of plaintiff's good faith in accepting the tickets to be submitted to a jury."

Defendant contends that the condition of some of the warehouse receipts received by plaintiff was such as to put it on guard and cause plaintiff to inquire about said receipts.

The record discloses that some of the warehouse receipts had some figures on the reverse side thereof and that a few of the receipts were indorsed by the Oklahoma Cotton Growers. Some of the receipts had had computations made on the back thereof. The testimony showed that it was the usual custom to figure on the back of a cotton warehouse receipt and the fact that figures were made thereon was nothing out of the ordinary.

One of the witnesses, who was an employee of defendant, testified that according to the appearance of the warehouse receipts a person would be entitled to cotton described in the receipts when presenting the same and that there was nothing in the receipts to indicate their invalidity.

Defendant contends that the matter of plaintiff's good faith in accepting said tickets was such that it should have been submitted to the jury. Defendant relies upon our law relative to negotiable instruments in support of said contention.

However, section 11180, subd. 2, C. O. S. 1921, is as follows:

"A thing is done 'in good faith' within the meaning of this act, when it is in fact done honestly, whether it be done negligently or not."

The rule just announced from the Uniform Warehouse Receipts Act provides that if the matter is done honestly, even though done negligently, the same is in good faith.

There is no question but what the actions of the bank in receiving the warehouse receipts on the loan in controversy was an honest transaction. Defendant attempts to show that plaintiff was negligent in receiving the receipts, but under the rule just announced in the statute, even though they were negligent, it did not affect their good faith.

After a careful review of the record, and authorities, we hold that the decision of the trial court was proper in all respects and that the same is hereby affirmed.

CLARK, V. C. J., and RILEY, HEFNER, SWINDALL, and McNEILL, JJ., concur. ANDREWS and KORNEGAY, JJ., dissent. LESTER, C. J., absent.