GOOCH v. NATURAL GAS SUPPLY CO.

No. 25742. Nov. 12, 1935.

Rehearing Denied Dec. 3, 1935.

154

William Pfeiffer, for plaintiff in error.

Bailey & Hammerly, for defendant in error.

PER CURIAM. This is an action by Sarah Gooch, of Schell City, Mo., against the Natural Gas Supply Company, an Oklahoma corporation, with its principal and only place of business in Chickasha, Okla., for damages in the sum of $1,000 for the refusal of the corporation to recognize her as the holder of 100 shares of its capital stock of $10 par value, for which she alleges she paid the $1,000. The case was tried to the court without a jury and resulted in a judgment for the defendant, from which she has appealed to this court. We shall refer to her as plaintiff and the company as defendant.

In her petition plaintiff alleged that she purchased the stock certificate, which she exhibited, because it bore the signature of one V. A. Reardon, vice president of the company, and who she alleged was acting within the apparent scope of his authority in the issuance of the stock "as affecting her right for the relief prayed for" and that prior to the issuance and delivery of the certificate she had had no contractual relation with the defendant and that she acted in good faith and relied upon the issuance of the certificate by Reardon as vice president. She alleged she paid or caused to be paid the $1000 direct to Reardon "in his official capacity as vice president", but the defendant had refused to recognize her as a stockholder and that she had been damaged to the extent of her investment and prayed

for judgment in that amount and tendered the certificate into court for the benefit of the defendant.

Defendant answered that the stock certificate was a forgery and not issued by or under the authority of the defendant or by any one authorized by it to do so and denied that Reardon was acting within the apparent scope of his authority in issuing the certificate, if, in fact, he ever issued it, and alleged that, under the laws of Oklahoma and the by-laws of the defendant corporation, no person could become a stockholder except by proper entry on its books, and that plaintiff had never been entered as a stockholder on the books of the company and had never been a stockholder thereof, and that if she had ever paid Reardon any money and received from him a purported stock certificate, she was guilty of gross carelessness and negligence in so doing, inasmuch as no such certificate had been authorized by the company or its proper officers, and that if plaintiff had any such certificate it was a forgery and utterly void and of no effect. The answer was verified. Plaintiff replied with a general denial.

Just before trial defendant was allowed to amend its answer to show that at the time the purported certificate was issued all the stock of the corporation had been issued It was stipulated at the trial that Reardon was vice president on the date the certificate bore and that his signature thereon was genuine. Thus there were two issues raised by these pleadings: First, whether plaintiff acquired the certificate in reliance upon the apparent authority of Reardon to issue it; second, whether the certificate was a forgery. Plaintiff had the burden of establishing the first, defendant the second. We think plaintiff failed and defendant succeeded.

The evidence showed that plaintiff did not acquire the certificate through any efforts of Reardon nor with prior knowledge that his name would appear on the certificate. She acquired it solely through the representations and efforts of one T. E. Burns, a stock salesman from Kansas City, whom she had known for a year or so prior to this transaction. He was in no way connected with the company and was unknown to any of its officers except, doubtless, Reardon. She did not know Reardon, had never met him, had never seen him, had never heard of him until she received the certificate. Burns had been her confidential business and investment advisor

in whom she placed the utmost confidence, even entrusting him with the collection of dividends for her on other investments. On October 20, 1930, she gave him her check for $1,000 on her savings account in a Schell City bank, payable to defendant's order, ostensibly for defendant's stock. Burns cashed this check two days later at a Kansas City bank by indorsing the check as defendant's agent. Later plaintiff received through the mail a purported certificate for 100 shares of defendant's capital stock, dated October 21, 1930, signed by Reardon as vice president and bearing the purported signature of one W. M. Burwell as secretary, and an impression of the purported seal of the corporation. The certificate was numbered 102 and was accompanied by a letter on defendant's stationery, signed by Reardon, in which he said the board of directors had just authorized an extra dividend of 3 per cent. to be paid January 1, 1931, along with the regular quarterly dividend of 7 per cent., and offering assistance to her in her investments whenever she needed it. Sometime in January, 1931, she received through the mail a check on a Kansas City bank signed either by Burns or Reardon, she could not recall which, nor could she remember the name of the bank, for about $3, which she took to be the extra dividend. The check also was accompanied by a letter on company stationery signed by Reardon, congratulating her for being able to receive the dividend. Later in the month Burns brought to her in cash what she was led to believe was the regular quarterly dividend of the company. This was the last she ever received. She had not seen Burns for two years prior to the trial and did not know where he was. Her testimony was positive that she purchased the purported stock upon the sole representations of Burns and her implicit reliance upon him. There was no evidence that she had relied on anything that Reardon had done or said, or through any apparent authority vested in him by the company. No effort was made to connect the company with the transaction other than to show that Reardon signed the certificate.

Defendant was organized in the early part of 1930 with a capitalization of $100,000. All of the stock was issued immediately after organization. The corporation was purely a local affair. Its stockholders were limited in number and confined for the most part to intimate friends of its president and treasurer, B. P. Siddons, and of its secretary, Harry Hammerley. These two men

have held office continuously since the corporation was organized. V. A. Reardon was its vice president during the transaction involved in this suit, but was dismissed shortly thereafter. The stock of the company has not been listed on any exchange. It is not dealt with in the open market. It has never paid any dividends, nor has it carried a bank account in Kansas City. But 100 stock certificates were ever printed by the corporation and these were numbered consecutively from 1 to 100. Not more than 75 have been issued. Unissued certificates, together with the records of the corporation, have been continuously in the exclusive possession of the secretary. There is no evidence that Reardon, as vice president, ever had any of them in his possession, or was ever entrusted with any duties involving their custody. There is no evidence that he was ever authorized to issue or to sign stock certificates, or that he had ever issued or signed any valid ones. The record is silent as to any unusual duties vested in the vice president. The by-laws of the corporation provide that he shall "preside at the meeting of the stockholders and directors in the absence of the president, and upon a vacancy occurring in the office of the president, shall act as such and have full authority in the premises until his successor is chosen." There is no evidence that the corporation ever held Reardon out as clothed with apparent authority to perform any other act, including that of signing certificates on behalf of the corporation. At one place in the testimony, Burwell, the superintendent, whose signature had been forged to the certificate, on cross-examination in answer to the leading question as to whether Reardon was an active vice president, replied that he was. Plaintiff makes much of this as evidence that Reardon had authority to sign the certificate. There is nothing to this contention. Assuming that the witness understood the question in the sense plaintiff's counsel meant it, there is no evidence in the record as to what the duties, if any, of an active vice president were, different from those prescribed by the by-laws. These did not include issuing stock certificates or selling stock. The certificate bore a fictitious seal, shown by the evidence to have been even a poor imitation. Its number exceeded that provided by the company. It was never in the custody of the company. Burwell was superintendent of properties and not even a stockholder. He held no office. He testified that his signature was a forgery. The certificate was clearly a forgery and worthless. Plaintiff

was clearly a victim of the fraud of Burns and Reardon, for which the defendant is not liable.

Plaintiff presents two assignments of error. The first is that the trial court permitted the defendant to introduce in evidence over her objection, those provisions of its by-laws defining the duties and powers of its respective officers. According to these provisions the power to sign stock certificates is vested solely in the president, to be attested by the secretary. The latter is entrusted with the stock book and the corporate records and seal, with sole authority to affix the latter. The powers of the vice president are set out above. Plaintiff urges that she had no prior contractual relations with the corporation, and could not be bound by those limitations upon what she terms were the apparent powers of the vice president. There might be some force to her argument had she dealt with Reardon and been deceived by any apparent authority on his part, and introduced evidence of what this apparent authority was. But she did not deal with him. She dealt exclusively with Burns. She never saw Reardon. She was never brought in contact with him. The whole affair was negotiated and carried out by Burns. Reardon's signature on the certificate had nothing whatever to do with her purchasing it. He was not authorized to issue any certificates. The company received none of the money. It paid her no dividend. It did not record her as one of its stockholders. She was not deceived by any act of Reardon's. The error, if any, in admitting the evidence, was harmless. Furthermore, defendant denied that Reardon was acting within the scope of his authority. It was entitled to show what his actual authority was. Section 9745, Okla. Stats. 1931, provides:

"All corporations for profit must issue certificates of stock when fully paid up, signed by the president and secretary."

The by-laws complained of have the same provision. This is the customary and usual method of signing stock certificates. This certificate was not signed by any one authorized to sign it. Plaintiff's authorities to support this assignment are not in point because she did not act upon any apparent authority vested in Reardon contrary to what the by-laws provided.

In the cases she cites there had been reliance upon the apparent authority with which the officers had been clothed. These cases are all from Michigan. The first cited, Roger Angstman Co. et al. v. Liggett Spring & Axle Co. (Mich.) 255 N. W. 428, is typical of the others, and since it is the latest and cites the others, we review it only. Plaintiffs had contracts with the defendant signed by one Ackerman as general manager. Ackerman was in full charge and had apparent authority in all matters connected with the defendant's business. The plaintiffs dealt directly with him and the evidence showed that they relied exclusively upon his apparent authority. It was sought to limit this authority by the testimony of a superior officer. This was held to be error, since any limitations upon Ackerman's apparent authority were not binding on others unless communicated to them. The other cases are similar. In each there was exclusive reliance upon the apparent authority of the corporation agent or officer.

Plaintiff's second assignment is that the judgment is against the clear weight of the evidence, and the trial court erred in rendering judgment against her and in overruling her motion for new trial.

Her first contention here is similar to the one presented in her first assignment, namely, that the defendant is bound by Reardon's apparent authority to sign the certificate. But this position, as we have shown, is erroneous because plaintiff did nothing in reliance upon any such authority. She relied, according to her own testimony, upon the representations of Burns. She cites several cases in support of this contention: Green v. Caribou Oil Mining Co. (Cal.) 178 P. 950. In this case the stock certificate was signed by the vice president and by the secretary, who were both authorized to sign. It bore the true corporation seal, and was in every respect and to all intents and purposes a genuine instrument. Green had the certificate by way of a pledge for a loan of money to the secretary, Lewis, for the latter's own personal use. The certificate was made out to Lewis. The facts indicated that the company had permitted these two men to issue certificates, and there was nothing in the transaction to indicate that Green was at fault. In the case at bar it was the plaintiff's negligence in her dealings with Burns that was responsible for her loss. The company did nothing. We think that the distinguishing feature between this case and the one at bar is that in it the certificate was issued by officers entrusted by the corporation with the duty of doing so, while in the case at bar the certificate was not issued by any officers entrusted by the corporation with the duty of issuing certificates.

United States Nat. Bank of Los Angeles

v. Stiller (Cal.) 14 P. (2d) 78. We find nothing in this case that bears upon the point at issue.

Jack v. Nat. Bank of Wichita, 17 Okla. 430, 89 P. 219. Here the corporation clearly held out Watkins as its treasurer and permitted him to perform a series of acts similar to the one involved in the case and received all the benefits of these transactions. It was said in that case:

"It is clear from the evidence that Watkins held himself out as treasurer of the company, and assumed to act as such, and that the company recognized his acts, and acquiesced in them."

The record in this case does not show a state of facts similar to the foregoing.

Security Trust & Savings Bank of Charles City, Iowa, v. Gleichmann, 50 Okla. 441, 150 P. 908. There it was held that a corporation is not bound by the acts and is not chargeable with knowledge of one of its officers in respect to a transaction in which such officer is acting in his own interest. It was quite clear here that Reardon was acting in his own interest in connection with Burns rather than in the interest of the corporation.

Johnson Hat Co. v. Bank, 4 Okla. 17, 44 P. 192. The corporation accepted the proceeds of the fraudulent transaction and was not permitted to escape liability upon the ground that its president was acting without his lawfully constituted authority. He had been permitted by the corporation to openly engage in transactions similar to the one complained of.

Simpson v. Bergmann (Cal.) 13 P. (2d) 531. The officer whose conduct was complained of was in charge of the company's business with apparent authority to perform all acts which the corporation could perform. He signed a bond as surety for a building contractor, using a rubber stamp for the purpose, and his name, as assistant manager. Reliance was placed upon his apparent authority, and the corporation was not allowed to dispute it.

Whatever Reardon did was clearly in his own interest. This court said in B. F. C. Morris Co. v. Mason, 171 Okla. 589, 39 P. (2d) 1, 43 P. (2d) 401:

"A corporation is not bound by the acts, nor chargeable with knowledge, of one of its officers in respect to a transaction in which the officer is acting in his own interest."

In Kocher v. Supreme Council Catholic Benevolent Legion, 48 Atl. 544, the Court of Errors and Appeals of New Jersey, after stating its recognition of the general rule that if officers of a corporation are held out by the corporation as having certain authority the corporation is bound by their acts, said:

"But this immunity is extended to those only dealing in good faith with such officers, and who do not know, or are not bound to know, the limitations of their power by the provisions of the company's charter." (Emphasis ours.)

It was held error to deny the corporation the right to show by its by-laws the limitation on the powers of its secretary.

Schlessinger v. Forest Products Co. (N. J. L.) 76 Atl. 1024, the same court said:

"In order that a corporation may be bound by the acts of one as its agent, either upon the ground of an implied authority or of estoppel, it must appear that the corporation is chargeable with notice of the acts or omissions relied upon to establish such implied authority or estoppel."

In Camden Land Co. v. Lewis (Me.) 63 Atl. 523, it was held that the president of a corporation has no implied authority to sell treasury stock of a corporation.

In Ryder v. Bushwick R. Co. (N. Y.) 31 N. E. 251, the court held, as stated in the headnote:

"Certificates of stock issued by the president of a corporation on the authority of an executive committee appointed by the directors out of their number, but without having been authorized or ratified by the directors, confer no rights on one who is not a bona fide purchaser for full value."

In Quaker Oil & Gas Co. v. Jane Oil & Gas Co., 63 Okla. 234, 164 P. 671, this court held that the president of a corporation has no inherent authority by virtue of his office to contract for the corporation, his power in that respect being no greater than that of any other director.

A corporation in the nature of things acts only through an agent who must have authority to act. Milburn v. Miners & Citizens Bank, 101 Okla. 281, 226 P. 42.

Agency is never presumed, but is a question of fact to be proved. Gardner Petroleum Co. v. Looper, 105 Okla. 297, 232 P. 949.

It is incumbent upon a person dealing with an alleged agent to ascertain, at his peril, the nature and extent of the agency. Kindl v. Doss, 167 Okla. 383, 29 P. (2d) 946; Mabee v. McWaters, 151 Okla. 10, 1 P. (2d) 636; Shuler v. Viger, 123 Okla. 110, 252 P. 18.

Reardon was clearly acting for himself. Under such circumstances the corporation is not bound. Maryland Casualty Co. v. First State Bank et al., 101 Okla. 71, 223 P. 701; Newland v. First Nat. Bank of Buffalo, 91 Okla. 169, 216 P. 932; Security Trust & Savings Bank v. Gleichmann, supra.

The corporation did not receive the benefits of the transaction. It repudiated the same as soon as it acquired knowledge thereof.

That the certificate was a forgery is not open to dispute. Section 2128, Okla. Stat. 1931, defines as forgery the issuance of spurious certificates of stock:

"Any officer or agent of any corporation or joint stock association formed or existing under or by virtue of the laws of this state, or of any other state, government or country, who within this state, willfully signs or procures to be signed, with intent to issue, sell or pledge, or to cause to be issued, sold or pledged, or who willfully issues, sells or pledges, or causes to be issued, sold or pledged, any false or fraudulent certificate or other evidence of the ownership or transfer of any share or shares of the capital stock of such corporation or association, whether of full-paid shares or otherwise, or of any interest in its property or profits, or of any certificate or other evidence of such ownership, transfer or interest, or any instrument purporting to be a certificate or other evidence of such ownership, transfer or interest, the signing, issuing, selling or pledging of which has not been duly authorized by the board of directors or other managing body of such corporation or association having authority to issue the same, is guilty of forgery in the second degree."

"Forgery" is defined in 26 C. J. 31, page 896, as:

"The false making or materially altering, with intent to defraud, of any writing, which if genuine might apparently be of legal efficacy, or the foundation of a legal liability."

This brings us to what counsel for defendant say in their brief is the real question in the case:

"What is the liability of a corporation for the acts of its officers in forging a purported certificate of stock in the name of the corporation?"

We think the following authorities cited by counsel correctly answer the question:

Dollar Savings Fund & Trust Co. v. Pittsburgh Plate Glass Co., (Pa.) 62 Atl. 916. The glass company had caused a certificate for 75 shares of its stock to be signed by its president and secretary and its seal affixed and left where one Alward, a clerk, had access to it. To be valid the certificate had to be countersigned by the Union Trust Company, as registrar, and the certificate bore a notation to that effect. Alward forged the name of Carr, an officer of the trust company, and indorsed the certificate to one Lillian Alward, who pledged it to plaintiff bank for a loan. The same contention was made there as here, that the certificate was binding on the defendant in spite of the forgery. Among other things, the court said in holding the corporation not liable:

"All the cases show that it is only when a party holds a certificate to which is attached the genuine signatures of the parties who must sign to make it good, that the question arises as to whether or not the company is liable to him because of negligence, when the certificate is in fact false by reason of having been improperly or fraudulently issued. * * *

"Until the plaintiff shows a certificate, to which are attached the genuine signatures of all the parties whose signatures are necessary to its validity, he is not even entitled to enter the lists where the contest as to the negligence of the company is to be fought out."

Hill v. C. F. Jewett Pub. Co. (Mass.) 28 N. E. 142. The by-laws of the defendant corporation required stock certificates to be signed by the president and the treasurer. There was no special provision that he should issue them. Jewett, the president, had been guilty of past misconduct, but in spite of that the corporation allowed him access to its certificates. He signed his name and forged the treasurer's name to two of the certificates and pledged them to a bank to secure his individual indebtedness. In refusing to hold the corporation bound on the certificates, the court said in part:

"The chief safeguard in respect to the certificates is the necessity of two signatures; and, accordingly, when one who has had confidence reposed in him has availed himself of his opportunity to commit a fraud upon others by means of forgery, it has usually been held in England that the loss was not a natural or probable result of the confidence thus reposed, even though it showed carelessness, and that it was too remote to be properly chargeable upon those who were thus careless in reposing the confidence. * * * The president of the defendant corporation was not the proper officer to issue certificates, and the certificates which the plaintiffs received did not come from the office of the defendant in regular course of business, but they were received by the plaintiffs under private and personal transactions between themselves and Jewett, the president. * * *

"On the whole, we find nothing to show

that the corporation or its other members, had reason to suppose from what Jewett had done that he would be likely to issue forged certificates of shares, if allowed access to the certificate book and seal of the corporation; and accordingly it is not to be held responsib'e for his criminal fraud, as for an act made possible by its negligence. In the cases heretofore determined by this court, where a corporation was held responsible for the fraudulent issue of shares, the certificates were in fact signed by the proper officers, whose signatures were required, and there was carelessness on the part of the president in leaving certificates signed in blank by himself with the treasurer, and also carelessness on the part of other officers of the company."

Rogers v. Southern Fiber Co. (Va.) 44 So. 442; the facts and law are stated in the syllabus by the court:

"Though the president and local agent of a foreign corporation has acted in its name, in a fraudulent transaction, wherein he had received money for subscription to the stock, of the corporation, and has delivered bogus instead of genuine stock, the corporation is not liable, where it has in no way profited by the transaction and the officer was not authorized to issue the genuine stock of the corporation, and especially is this the case where the officer was not even trusted with the blank certificates of stock of the corporation, or with its stock book, or with its seal and was not held out as having authority to issue its stock or to receive subscriptions to its stock or to receive money in its name or for its account."

Manhattan Life Insurance Co. v. Forty-Second & G. St. Ferry R. Co., 139 N. Y. 146. Allen, president of the insurance company, took a blank certificate of stock, signed by Green, a former president, who had died in the meantime, dated it back to the period of the latter's presidency, and forged the name of the then treasurer, also deceased, and signed his own name as secretary and transfer agent, an office he formerly he'd, and filled in his own name as a stockholder and used this as collateral to obtain a loan. It was held that the company was not liable on the certificate.

"While the signatures of Green and Allen were genuine, they were not then the officers of the defendant, which the certificate represented them to be, and the act of making and uttering the instrument was a forgery as to all the names written thereon. * * *

"The rule which imposes a liability upon the principal for the unauthorized acts of his agent is founded upon public policy, and is well defined. It is limited to cases where there was an apparent authority to do the act in question, and it appeared to have been done in the course of his employment as agent, and was within the scope of his general powers. None of these grounds of liability have been shown here. The agency did not exist in 1888, which was necessary in order to deprive the principal of the right to disclaim responsibility for the unauthorized act. With respect to the creation of certificates bearing date in 1881, he was as destitute of authority as if he had been a stranger to the corporation. He not only could not issue them, but he could take no part in their issue, or do any 'act required by law or by the by-laws essential to give them validity. When he issued such a certificate in his own name, he was not apparently acting within the scope of any general authority conferred upon him by the corporation. The defendant cannot justly be held liable for the misuse of a power which it never created."

We call attention to the fact that plaintiff did not plead, and therefore cannot rely upon, any purported negligence on the part of the defendant in employing Reardon as an officer, but is compel'ed to rely solely upon her allegation that she bought the stock upon the alleged apparent authority of Reardon to execute it.

Even if the certificate were not a forgery, it would nevertheless be void, because it would have represented an overissue of stock, and such issue is declared void by section 9746, Okla. Stats. 1931. In Pruitt v. Oklahoma Steam Baking Co. et al., 39 Okla. 509, 135 P. 780, in enforcing this statute which then appeared as section 1238, Revised Laws 1910, we said:

"Certificates of stock issued in violation of the statute are wholly valueless and void, without regard to the intent of the parties to the overissue."

Plaintiff's second and final contention under this asignment is that she is entitled to the benefit of the rule that, where one of two persons must suffer loss by fraud or misconduct of a third, the one who makes the loss possible must bear the loss, and that under this rule the defendant should bear the loss, since it had Reardon in its employment. Plaintiff cites Joy v. Farmers Nat. Bank of Chickasha, 158 Okla. 1, 11 P. (2d) 1074. In that case one Trueblood was the general manager of defendant's place of business. Trueblood had in his possession the warehouse receipts and by means of some of these receipts obtained a loan of money from the bank. Joy, the owner of the warehouse, lived in Texas and seldom came to the Chickasha plant. The bank had long known Trueblood as having full charge of the business,

and the court agreed with its contention that Joy should suffer the loss, since the bank was authorized to rely upon Trueblood's apparent authority, and as between the bank and Joy the latter should suffer the loss because such loss was made possible through his instrumentality.

As we have repeatedly stated, plaintiff in the case at bar has failed to show any apparent authority in Reardon to issue certificates of the corporation, or that she relied upon any such authority.

In this connection we again refer to the case of Dollar Savings Fund & Trust Company v. Pittsburgh Plate Glass Co., supra, wherein the court said on this point:

"That 'where one of two innocent persons must suffer from the fault of a third, the loss must be borne by the one whose negligence enabled the third person to commit the fraud,' is a generalization sanctioned by use for considerably more than a century, but, like many another excellent rules, its application calls for discretion and discrimination, and when plaintiff fails in a duty of care which he owes to himself, fully as imperative as any owed to him by defendant, and thus, and thus alone, brings himself within the scope of the effects of defendant's negligence he cannot be heard to say that defendant's negligence and not his own was the proximate cause of his loss."

See, also, Hill v. C. J. Jewett Publishing Co., supra, wherein the same contention was made, and which the court met as follows:

"In order to reach this conclusion, it must be made to appear that the frauds and forgeries of Jewett were such natural and probable results of his continuance in the office of president of the corporation that the defendant * * * guarded against them, and also that the plaintiffs on their part exercised due diligence and precaution in accepting the certificates from him. In the absence of any previous misconduct on Jewett's part, it could hardly be maintained that there was any negligence on the part of the corporation in keeping its seal and book of certificates of shares where the president could have access to them, so as to be able to remove blank certificates from the end of the book and impress the corporate seal upon them. We are not aware that it is customary for corporations in this country to keep their seals or books of certificates in such a way that access to them can only be had when two or more officers are present."

We have considered counsel for plaintiff's argument in his reply brief that section 9745, Okla. Stats. 1931, supra, does not specifically require stock certificates to be signed by the president and secretary, and that the statute should be given a liberal construction to the end that justice may be rendered, but we are not impressed with the argument, because there is no evidence that plaintiff relied upon the manner in which the purported certificate was issued.

We feel that the judgment of the trial court was correct and should be affirmed. It is so ordered.

The Supreme Court acknowledges the aid of Attorneys H. R. Williams, R. H. Wills, and A. E. Montgomery in the preparation of this opinion. These attorneys constituted an advisory committee selected by the State Bar, appointed by the Judicial Counsel, and approved by the Supreme Court. After the analysis of the law and facts was prepared by Mr. H. R. Williams and approved by Mr. Wills and Mr. Montgomery, this cause was assigned to a Justice of this court for examination and report to the court. Thereafter, upon consideration, this opinion was adopted.

McNEILL, C. J., OSBORN, V. C. J., and RILEY, BUSBY, PHELPS, and GIBSON, JJ., concur. BAYLESS, WELCH, and CORN, JJ., absent.